UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LAI'TANYA DINKINS**,                     Case Number 1:13 CV 373

    Plaintiff,                              Judge Donald C. Nugent

    v.                                      REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                              Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Lai'tanya Dinkins, filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated February 20, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI on April 25, 2008, alleging a disability onset date of January 1, 2007. (Tr. 134, 137). Her claims were denied initially and on reconsideration. (Tr. 84, 87, 102, 109). Plaintiff requested a hearing before an administrative law judge (ALJ). (Tr. 116). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 19, 43). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 12); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 1481. On February 20, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### *Vocational and Personal Background*

Born October 3, 1968, Plaintiff was 38 years old on the date she applied for disability benefits. (Tr. 34). Plaintiff has a high school education and past relevant work experience as a waitress, security guard, and cashier. (Tr. 34). Plaintiff attended continuing education courses in data entry and also attended a biweekly GED course. (Tr. 49-50, 191, 219, 275, 551, 553). Plaintiff claimed pain in her lower back, left leg, and left ankle prevented her from working. (Tr. 171, 210). She also complained of symptoms from asthma, depression, and angina. (Tr. 59, 552).

At the time of the hearing, Plaintiff testified she worked four hours per week at a retail store where she greeted customers and took inventory. (Tr. 50). At that job, Plaintiff refused to climb ladders but was "constantly" required to bend, pull, and stand. (Tr. 50).

Plaintiff lived alone and maintained personal care, prepared simple food, ironed, washed dishes, made her bed, used public transportation, spent two hours shopping every two weeks, read, and wrote poems. (Tr. 220-22, 245-47). Plaintiff had a driver's license but had not driven since 2006. (Tr. 51, 171).

When asked about a typical day, Plaintiff said she ate breakfast, took medicine, exercised, took a shower, got dressed, read, watched television, did homework, sat down, walked around her apartment, went to GED classes, and lied awake in bed. (Tr. 61-62, 219, 241, 275, 551). At the hearing, she claimed when the television was on, she did not really watch because she was constantly moving to avoid becoming stiff. (Tr. 61-62). Due to pain, Plaintiff said she used a cane; had difficulty sleeping; frequently cried; experienced mood swings; socially isolated

herself; and no longer rode the bus, cleaned the house, took baths, rode bikes, danced, skated, lifted more than three-to-five pounds, climbed stairs, stood or sat for longer than five to ten minutes, bent over, or went to church. (Tr. 52, 56, 68, 171, 181, 210, 219-24, 242-45, 552-53).

Plaintiff said she had a fear of stairs and experienced frequent crying spells. (Tr. 53, 55-56). When she returned home from work, Plaintiff said she was proud of herself and could not wait to get into the bathtub to soak. (Tr. 64). With the help of sleeping pills, Plaintiff indicated she slept for a "good ten hours". (Tr. 65). According to Plaintiff, Vicodin reduced her pain but she was trying to cut back. (Tr. 67). Finally, Plaintiff testified she recently stopped using her cane because she did not want to rely on it. (Tr. 61).

***Medical Evidence***

On July 9, 2004, Plaintiff went to Fairview Lakewood Lutheran Hospital (Fairview) with complaints of left calf pain. (Tr. 389). She was diagnosed with muscle strain and prescribed pain medication. (Tr. 390).

On July 19, 2004, Plaintiff visited the Center for Corporate Health complaining of pain in both her lower extremities. (Tr. 405). On examination, she was alert and well-oriented but physically had trouble mounting the examination table. (Tr. 405). She was assessed with bilateral lower extremity pain and tenderness and told to rest, elevate, use cold and hot compresses, and take Motrin. (Tr. 405).

On July 21, 2004, Plaintiff followed up with Radha R. Baishnab, M.D., at the Center for Corporate Health claiming her back pain had not improved and she continued to feel severe pain all over her left lower extremity. (Tr. 409). Dr. Baishnab noted Plaintiff was too weak to get out of her wheelchair. (Tr. 409). He diagnosed bilateral lower extremity pain and lumbar strain in the left sciatica. (Tr. 409).

On July 29, 2004, Plaintiff returned to Fairview with complaints of lower-left extremity pain. (Tr. 413). She was diagnosed with lumbar strain. (Tr. 413).

On August 5, 2004, Plaintiff saw Dr. Baishnab for a work status examination. (Tr. 415). He precluded her from work for five days. (Tr. 415). Plaintiff stated she was out of a wheelchair and able to walk around a little but had lost her job and had difficulty walking. (Tr. 417). An MRI revealed mild L5-S1 disc degeneration, mild central canal stenosis, and mild neural foraminal narrowing. (Tr. 417). Although she continued to complain of pain and stiffness in her left ankle, Plaintiff was eventually cleared for light work on September 22, 2004. (Tr. 426, 436, 433, 438, 440).

On August 20, 2004, Plaintiff saw Kim L. Stearns, M.D., claiming her knee gave out while working a long shift as a security guard. (Tr. 439). An MRI revealed some mild degenerative changes in the L5 and lower lumbar levels. (Tr. 439). A physical examination revealed full range of motion in her ankle without swelling but tenderness over the Achilles' tendon. (Tr. 439). Dr. Sterns later diagnosed Achilles' tendonitis and recommended a course of physical therapy. (Tr. 426, 439).

In November 2005, Plaintiff slipped on a banana peel at work causing her to fall down concrete stairs and land on her buttocks, injuring her pelvis and lower back. (Tr. 123-24, 360, 545). She reported to the University Hospitals of Cleveland emergency room with complaints of pain on ambulation. (Tr. 287-88). She was prescribed pain medication and instructed to go on bed rest for two days. (Tr. 290).

On November 16, 2005, Plaintiff presented to Hazem Nouraldin, M.D., complaining of lower back pain. (Tr. 360). She had a decreased range of motion in the lumbar spine; was able to walk on her heels, toes, and squat without difficulty; and had a positive straight leg raise test.

(Tr. 360). Dr. Nouraldin diagnosed a lower back sprain with possible radiculopathy at L5-S1 and recommended Plaintiff stay off work for one week. (Tr. 360). A November 17, 2005, MRI of Plaintiff's lumbar spine revealed L4-5 bulging disc and left central herniation at L5-S1. (Tr. 463-64).

Plaintiff had regular follow-up visits with Dr. Nouraldin. (Tr. 341-74). Generally, she complained of low back pain and indicated the pain worsened with cold weather. (*Id.*; Tr. 341, 343, 372). On examination, Plaintiff regularly had decreased range of motion in the lumbar spine and was advised to lose weight, apply for epidural blockage, get an MRI, and continue attending physiotherapy or physical therapy and taking pain medication. (Tr. 341-74).

Plaintiff began treating with chiropractor Anthony J. Wyrwas, D.C., on November 18, 2005, for low back pain and left leg pain. (Tr. 458). Plaintiff complained of pain with walking, standing, and bending and indicated medication only dulled the pain. (Tr. 458). Dr. Wyrwas advised Plaintiff to use ice, myofacial release therapy, therapeutic stretching and strengthening, and recommended a home exercise plan. (Tr. 458).

On November 22, 2005, Dr. Wyrwas reviewed Plaintiff's November 2005 MRI and found concentric disc bulging at L4-5 and focal left central disc herniation causing displacement of epidural fat from the left lateral recess at L5-S1 without nerve root compression or displacement. (Tr. 457). Dr. Wyrwas concluded Plaintiff suffered a L5-S1 disc herniation as a direct result of her work injury. (Tr. 457). Dr. Wyrwas recommended Plaintiff receive epidural injections and/or multiple corticosteroid injections to help with pain and advised she continue her current treatment regimen including physical therapy, ice, lumbar disc decompression, and myofascial release therapy. (Tr. 457).

On May 27, 2006, Plaintiff reported to South Pointe Hospital's emergency room after she suffered a second injury while working as a security guard; she tripped and fell injuring her ankle. (Tr. 306-07). She was diagnosed with a sprained ankle and provided an ankle splint. (Tr. 314). Plaintiff did not complain of back pain at this time. (Tr. 274, 306-18). She was to return to transitional work for four days, limited to only sitting. (Tr. 317). An x-ray revealed no fracture, dislocation, or other bony or soft tissue abnormality. (Tr. 318).

However, on October 9, 2006, Plaintiff had decreased range of motion over her left ankle and mild swelling. (Tr. 325, 565). Subsequently, K. Kovach, D.P.M., performed a primary repair anterior talofibular ligament and calcaneofibular ligament operation on her left foot, which Plaintiff tolerated well. (Tr. 322, 327-28). Plaintiff did not report pain or stiffness following postsurgical rehabilitation. (Tr. 641).

Plaintiff had several follow up visits with Dr. Wyrwas for treatment of her lower back and left ankle pain. (Tr. 446-58, 623-642, 702-03, 761-63). Throughout these visits, Plaintiff complained of a varying degree of leg and low back pain. (*Compare* Tr. 455, 623-24, 626, 628, 635-36, 638 (noting increased pain) *with* Tr. 456, 449-450, 453, 625, 634, 637, 642, 702-03, 761, 763 (noting decreased pain)). Dr. Wyrwas consistently advised Plaintiff to continue physical therapy treatment and home exercises because generally, Plaintiff reported the home exercises were helpful. (Tr. 449, 453, 625, 634, 637, 642, 702-03, 761-63).

On February 8, 2007, Plaintiff returned to Dr. Nouraldin and reported radiating pain in her lumbar spine. (Tr. 343). On this and subsequent visits, Dr. Nouraldin advised Plaintiff to lose weight and continue physical therapy. (Tr. 343-46). His January 5, 2007, examination revealed a normal gait, no swelling or edema, and a normal range of motion in all extremities. (Tr. 344). Dr. Nouraldin diagnosed low back strain with L5-S1 disc herniation. (Tr. 344).

On May 2, 2007, Dr. Wrywas ordered a second MRI and referred Plaintiff to John H. Nickels, M.D., at Cleveland Back and Pain Management Center, Inc., for additional treatment. (Tr. 447-48). A May 16, 2007, MRI of Plaintiff's lumbar spine revealed a L4-5 disc herniation had increased in size when compared with the previous study but a left central disc herniation at L5-S1 was unchanged. (Tr. 462, 646-47).

On June 6, 2007, Plaintiff presented to Dr. Nickels complaining of lower back and left ankle pain. (Tr. 545). Dr. Nickels concluded Plaintiff had herniated discs at L5-S1 from her 2005 accident and at L4-5 from her 2006 accident. (Tr. 549). Plaintiff continued treating with Dr. Nickels regularly. (Tr. 534-37, 542-49, 648-50, 658-65, 686-87, 705-12). Throughout those visits, Plaintiff received medication management, examinations, and lumbar epidural nerve blocks. (*Id*.). Dr. Nickels also consistently indicated medication helped her pain, function, and quality of life. (*Id*.).

On August 8, 2008, Plaintiff underwent a lumbar manipulation under anesthesia due to the "failure of extended conservative care of condition through aggressive physical medicine, rehabilitation, [and] pharmacological intervention"; Plaintiff tolerated the procedure well. (Tr. 671-72).

On August 20, 2008, Dr. Nickels prepared a report for the Bureau of Disability Determination where he concluded Plaintiff was "completely and totally disabled" and was unable to do any active work "whatsoever" due to severe back pain with radiation down both legs and nerve damage with weakness and numbness. (Tr. 686-87). As part of that report, he relied on an increased L4-5 disc herniation demonstrated by the May 2007 MRI and Plaintiff's continued allegation of pain despite normal and conservative pain management treatment. (Tr. 686).

7

On February 15, 2008, Brian L. Bennett, D.C., concluded Plaintiff suffered from a bilateral sensory and motor radiculopathy/radiculitis of the L5 and S1 nerve roots. (Tr. 657). He recommended Plaintiff get an MRI or other advanced imaging study. (Tr. 657).

Beginning on August 17, 2009, Plaintiff had physical therapy at the Cleveland Clinic and underwent a vocational rehabilitation initial interview. (Tr. 718-35). There, the examiner indicated Plaintiff had strengths, such as a high school education, previous work as a security guard, and weight loss; but was limited by chronic pain with high pain level, disturbed sleep, multiple medical problems, psycho-social stressors, and reduced physical capacities. (Tr. 728). Although Plaintiff missed some sessions, at her last visit on August 24, 2009, she was able to walk for twenty to thirty-five minute intervals at a self-selected pace, ride the recumbent bicycle for fifteen to twenty minutes, stretch, and strengthen. (Tr. 718, 724).

On February 2, 2010, Elizabeth K. Dreben, Ph.D., conducted a psychological evaluation. (Tr. 753). There, Plaintiff complained of anxiety and panic attacks, decreased frustration tolerance, depression, isolation, fear of stairs and going out in crowds, limping, difficulty sleeping, and decreased appetite. (Tr. 753). Plaintiff reported she relied on her significant other and mother for social support and medications relieved her pain. (Tr. 754). Plaintiff was eager to return to work and indicated she felt physically "okay" and was able to do most things, although sometimes her leg or back would ache. (Tr. 755).

Plaintiff returned to Dr. Dreben a few weeks later for a rehabilitation psychology session. (Tr. 751). Plaintiff expressed excitement that she was working part-time for twelve-to-twenty hours per week in retail. (Tr. 751). She also said she had better stamina, confidence, and less trouble sleeping. (Tr. 751). Addressing Plaintiff's continued fear of stairs, Plaintiff and Dr. Dreben inspected a stairway together. (Tr. 751-52).

8

Plaintiff's progress continued, and on March 10, 2010, Plaintiff told Dr. Dreben she was working extra hours and continued to report better sleep habits. (Tr. 748-49). With Dr. Dreben, Plaintiff ascended and descended a flight of fourteen stairs five times, each time with improved confidence and reduced anxiety. (Tr. 749). Plaintiff said she did not feel any pain at that time. (Tr. 750).

On June 24, 2010, Dr. Nickels concurred with Dr. Wyrwas that Plaintiff was unable to return to work and authorized three lumbar epidural nerve block treatments. (Tr. 765).

***Bureau of Workers' Compensation***

In connection with her claim for workers' compensation benefits, Plaintiff underwent a number of independent medical examinations.

On January 9, 2007, Gordon Zellers, M.D., indicated Plaintiff could occasionally lift or carry up to ten pounds and could never lift or carry more than ten pounds. (Tr. 581). Plaintiff could occasionally bend, reach below the knee, stand, walk, and lift above the shoulders; could never push, pull, squat, or kneel; could frequently twist and turn; and continuously sit. (Tr. 581). Despite these restrictions, Dr. Zellers found Plaintiff was able to work a forty-hour workweek. (Tr. 581).

On January 16, 2007, Dr. Zellers recommended Plaintiff use an ace wrap and cane and continue formal rehabilitation, at-home physical therapy, and pharmacologic therapy. (Tr. 579). He concluded Plaintiff could not return to work as a security guard due to trouble with prolonged ambulatory activity. (Tr. 580).

On March 15, 2007, Patrick Bray, M.D., examined Plaintiff in response to her complaints of lower back pain radiating down her left leg. (Tr. 444). Plaintiff said she was uncomfortable sitting for more than twenty minutes and walking more than ten minutes. (Tr. 444). She avoided

9

bending and pushing and felt better when lying down with her legs raised. (Tr. 444). Plaintiff grimaced and cried throughout the examination, which revealed diffuse tenderness and mild spasm over the lower lumbar paraspinous muscles, especially on the left side; a dragging left leg; negative strait leg raise test; and no evidence of motor or sensory impairment. (Tr. 444-45).

On April 19, 2007, R. Scott Krupkin, M.D., opined Plaintiff had met maximum medical improvement despite ongoing rehabilitative treatment. (Tr. 573-74). Dr. Krupkin concluded Plaintiff could return to work as a security guard so long as she was limited to occasional walking. (Tr. 575).

On May 4, 2007, Nicholas J. Hadzima, D.C., examined Plaintiff and noted motor and sensation weakness, decreased range of motion, guarding, tenderness, normal station and gait, and diminished reflexes. (Tr. 441).

On November 9, 2007, Karl V. Metz, M.D., concluded Plaintiff did not incur a herniated disc at the L4-5 level as a result of her industrial injury of record. (Tr. 570). As support, Dr. Metz cited to Plaintiff's MRIs; absence of lower back complaints in the May 27, 2006 emergency room notes and corresponding incident report; and lack of evidence of re-injury to her lower back subsequent to May 27, 2006. (Tr. 570). He concluded the MRI was consistent with an evolutionary progression of aging of the lumbar spine and unrelated to trauma. (Tr. 570).

On March 27, 2008, Antony M. George, M.D., M.P.H., recommended Plaintiff return to work with significant restrictions related to walking, standing, and lifting, and opined that strengthening programs and a home exercise plan were "absolutely necessary" for recovery. (Tr. 563).

On March 10, 2009, Kathleen L. Reis, CRC, completed an Initial Assessment Report. (Tr. 273). Plaintiff expressed fear of re-injury, agreed she had trouble gaining sufficient energy

to consistently accomplish tasks essential to her medical and vocational recovery, and experienced adverse side effects from anti-depression medication. (Tr. 275-76). Ms. Reis indicated Plaintiff was highly motivated to return to work but suffered from several physical and mental limitations. (Tr. 276). Ms. Reis was "undetermined" as to whether Plaintiff could return to work. (Tr. 277).

***Consultative Examinations***

Nicolas Ahn, M.D., examined Plaintiff on May 7, 2008. (Tr. 556). He noted Plaintiff had full non-tender range of motion on all joints and in the lumbar region, five (out of five) strength in both upper and lower extremities, normal reflexes, and negative ankle clonus and Hoffmann's on both sides. (Tr. 557). He observed Plaintiff in the waiting room and noted she walked with a normal gait and without her cane. (Tr. 557). In the examination room, Dr. Ahn indicated Plaintiff used the cane in the incorrect hand. (Tr. 558). Dr. Ahn concluded the examination was "completely normal" and he had "very significant concerns regarding inconsistent pain behaviors regarding the left ankle, as well as the low back." (Tr. 558). He concluded Plaintiff's symptoms appeared mainly due to symptom magnification and nonorganic pain. (Tr. 558).

On October 22, 2008, Franklin D. Krause, M.D., indicated Plaintiff had been dropped off for her appointment at the wrong building, so she walked about fifteen minutes down an access road to get to the appointment. (Tr. 689). Plaintiff cried during range of motion testing, but her range of motion was full aside from significant discomfort with muscle strength testing of her left hip. (Tr. 690). Dr. Krause diagnosed history of lower back injury without clinical evidence of radiculopathy but noted marked discomfort during the physical exam. (Tr. 690).

On June 2, 2008, Sally Felker, Ph.D., conducted a mental status examination. (Tr. 551). Plaintiff arrived at the exam by bus and was cooperative and neatly groomed. (Tr. 551-52).

11

Plaintiff brought a cane to the evaluation but Dr. Felker noted it was unclear whether she used it for support or in case of a misstep. (Tr. 552). Dr. Felker concluded Plaintiff had depressive disorder with some symptoms of anxiety. (Tr. 553).

***State Agency Review***

On June 6, 2007, Anton Freihofner, M.D., completed a physical residual functioning capacity (RFC) assessment. (Tr. 473-80). Dr. Freihofner primarily diagnosed asthma and secondarily diagnosed spinal injury, and noted left ankle instability and low blood pressure. (Tr. 473). Dr. Freihofner opined Plaintiff could lift and/or carry up to 50 pounds occasionally and up to 25 pounds frequently. (Tr. 474). Plaintiff could stand and/or walk and sit for a total of six hours in an eight-hour workday and had no limitation in ability to push or pull. (Tr. 474). Plaintiff could occasionally climb ladders, ropes, or scaffolds and did not have any manipulative, visual, or communicative limitations. (Tr. 475-77). Dr. Freihofner recommended Plaintiff avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 477).

On June 16, 2008, Catherine Flynn, Psy.D., conducted a psychiatric review technique. (Tr. 583). She concluded Plaintiff had the medically determinable impairment of depressive disorder with some anxiety symptoms. (Tr. 586). Plaintiff had a moderate degree of limitation in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 593). A corresponding mental RFC assessment was also completed. (Tr. 597-600). Dr. Flynn concluded Plaintiff's allegations of pain were only partially credible because Plaintiff claimed she could only pay attention for five minutes but attended GED classes, and claimed she needed a cane when the record was unclear as to how or when she used it. (Tr. 599). On November 14, 2008, Joan Williams, Ph.D., affirmed Dr. Flynn's assessment as written. (Tr. 697).

On July 16, 2008, Paul Heban, M.D., completed a physical RFC assessment. (Tr. 611). He concluded Plaintiff was able to lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand, walk, and/or sit for a total of six hours in an eight-hour workday; and push and/or pull without limitation. (Tr. 612). Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 613-15). Dr. Heban found Plaintiff's statements partially credible because although Plaintiff reported she could not stand for more than fifteen minutes or sit for long periods of time, she later reported she could walk half of a mile, grocery shop for two hours, and attend GED classes. (Tr. 616). On December 11, 2008, Ronald Cantor, M.D., affirmed Dr. Heban's assessment as written. (Tr. 700).

On July 21, 2010, Dr. Nouraldin conducted a physical RFC assessment. (Tr. 766-67). He opined Plaintiff could lift and/or carry up to ten pounds occasionally and less than ten pounds frequently; stand and/or walk for less than two hours during an eight-hour workday; and sit less than two hours during an eight-hour workday. (Tr. 767). Plaintiff would need to shift positions at will from sitting to standing or walking; be required to lie down at unpredictable intervals; and have limitations reaching, handling, fingering, feeling, pushing, and pulling. (Tr. 767). Dr. Nouraldin added Plaintiff's impairments would cause her to miss work more than three times per month. (Tr. 768).

**ALJ's Decision**

The ALJ determined Plaintiff had severe impairments including asthma; morbid obesity; herniated L4-5 and L5-S1 discs; status post-surgical procedure on a sprained left ankle with ligament tears; depressive disorder, not otherwise specified; and adjustment disorder with mixed emotional features. (Tr. 18). The ALJ concluded Plaintiff had the RFC to perform sedentary work except she could never climb ladders, ropes, and scaffolds; could only occasionally climb

stairs and ramps; required a sit/stand option; and must avoid concentrated exposure to fumes, odors, dust, gases, and poorly ventilated areas. (Tr. 20). Further, Plaintiff was limited to routine and repetitive tasks, which could be learned in 30 days or less; and superficial interaction with supervisors, co-workers, and the public. (Tr. 20). Considering VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could work in the national economy as a charge account clerk, food and beverage order clerk, and addresser. (Tr. 27-28). The ALJ concluded Plaintiff was not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ failed to provide good reasons for discounting the opinions of treating physicians Drs. Nickels and Nouraldin. (Doc. 8, at 14). Plaintiff's argument implicates the well-known treating physician rule.

***Treating Physician Rule***

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id.* at 409-410.

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment

16

relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Dr. Nouraldin

Dr. Nouraldin opined Plaintiff had the capacity to do less than sedentary work such that she would need to change positions every thirty minutes, lie down at unpredictable intervals, and miss more than three workdays per month. (Tr. 766-68).

In assigning Dr. Nouraldin's opinion little weight, the ALJ found Dr. Nouraldin's assessment was inconsistent with Plaintiff's reported activities of daily living and the medical evidence of record, which showed Plaintiff had a normal gait, normal strength, and normal neurological findings "at times". (Tr. 22). According to her regulatory obligations, the ALJ challenged the consistency of Dr. Nouraldin's opinion with the record as a whole. § 404.1527(d)(2). Simply stated, the ALJ provided "good reasons" to afford Dr. Nouraldin's opinion little weight.

Regarding activities of daily living, the ALJ noted Plaintiff maintained personal care, washed dishes, made her bed, prepared simple meals, attended biweekly GED classes, read, worked several hours per week, took baths, grocery shopped, and exercised. (Tr. 26, 33, *referring to*, Tr. 50, 61-62, 219, 241, 275, 553, 751). These activities are inconsistent with Dr. Nouraldin's opinion in that they require some amount of physical activity and also some degree of concentration in a classroom environment; thus, the ALJ properly questioned the consistency of Dr. Nouraldin's opinion with Plaintiff's activities of daily living.

With respect to objective medical evidence, the ALJ balanced Dr. Nouraldin's opinion against the record as a whole. Plaintiff alleges "numerous objective findings on examinations and

MRI studies" support Dr. Nouraldin's opinion. (Doc. 14, at 11). However, the standard is not whether there is evidence to support a contrary position, but whether substantial evidence supports the ALJ's conclusion. *Walters*, 127 F.3d at 532. Upon review of the record, substantial evidence supports the ALJ's assignment of weight.

As the ALJ pointed out, Plaintiff exhibited five (out of five) strength, a normal gait, no swelling, no edema, and a normal range of motion at her April 2007 visit to Dr. Nouraldin. (Tr. 28, *referring to*, Tr. 331-32). Moreover, Dr. Nickels' treatment notes evidenced a conservative treatment regimen consisting of narcotic pain relievers, anti-inflammatory medications, and neurological medications, all of which reduced Plaintiff's pain. (Tr. 29, *referring to*, 534-37, 542-49, 648-50, 658-65, 686-87, 705-12). Dr. Wyrwas regularly noted Plaintiff had reduced pain in her lower back and left extremity and he reported home stretches were helpful overall. (Tr. 29, *referring to*, Tr. 456, 449-450, 453, 625, 634, 637, 642, 702-03, 761, 763).

The ALJ additionally cited to Dr. Ahn's opinion, which demonstrated a grossly normal physical examination and strong indicia of symptom magnification and nonorganic pain; including the fact Plaintiff carried her cane in the wrong hand and walked normally in the waiting room. (Tr. 30, *referring to*, Tr. 556-58). Moreover, the ALJ discussed Dr. Metz's opinion that Plaintiff inconsistently reported back pain, Dr. Krupkin's report that physical therapy was helpful and Plaintiff could perform light work, Dr. Dreban's note that Plaintiff ascended and descended stairs, and also Plaintiff's credibility issues. (Tr. 30, 33, *referring to*, Tr. 570, 573-74, 749).

In sum, the ALJ provided "good reasons" for affording Dr. Nouraldin's opinion little weight; namely, Dr. Nouraldin's opinion was inconsistent with Plaintiff's activities of daily living and unsupported by the objective evidence of record.

Dr. Nickels

For his part, Dr. Nickels opined Plaintiff was completely disabled and unable to return to any active work "whatsoever". (Tr. 686-71). The ALJ afforded Dr. Nickels' opinion little weight because it opined on an issue reserved to the Commissioner, was inconsistent with his own treatment record, and was based on Plaintiff's subjective statements of pain. (Tr. 29). Consistent with her regulatory obligations, the ALJ challenged the supportability of Dr. Nickels' opinion. § 404.1527(d)(2).

First, as the ALJ explained in her decision, issues of disability are reserved to the Commissioner, not the treating physician. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365, 367 (6th Cir. 1984); Social Security Ruling (SSR) 96-5p, 1996 WL 374183. However, "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5p, 1996 WL 374183, at *3. So, Dr. Nickels' opinion that Plaintiff is precluded from work is only persuasive if it is supported by the record. However, Dr. Nickels' restrictive opinion is inconsistent with the record for the same reasons Dr. Nouraldin's restrictive opinion is inconsistent with the record, as outlined above and in the ALJ's opinion.

Next, the ALJ noted Dr. Nickels' opinion was inconsistent with his own treatment records. (Tr. 29). In short, despite treating Plaintiff conservatively and consistently noting medication reduced Plaintiff's pain in treatment notes, Dr. Nickels opined Plaintiff's pain was not relieved with medication. (Tr. 687). Indeed, the ALJ pointed to treatment notes where Dr. Nickels prescribed conservative treatment including narcotic pain relievers, anti-inflammatory medications, and neurological medications. (Tr. 29, *referring to*, Tr. 534-37, 542-49, 648-50,

658-65, 686-87, 705-12). The treatment records also reflected that Plaintiff's medication helped Plaintiff's pain, function, and quality of life and did not cause side effects. (*Id*.) Furthermore, despite Plaintiff's allegations of pain, Dr. Nickels consistently recommended Plaintiff continue physical therapy and other conservative treatment measures. (*Id*.). Clearly, there are inconsistencies between Dr. Nickels' treatment notes and his restrictive opinion.

The ALJ also determined Dr. Nickels' opinion was based on subjective complaints of pain, which the ALJ found to be less than credible. Plaintiff takes issue with this explanation because Dr. Nickels' opinion indicated it was based on the objective MRI evidence and clinical findings on examination. (Doc. 14, at 12).

To be sure, Dr. Nickels referenced the 2007 MRI and Plaintiff's treatment history in his opinion. (Tr. 686). But, the opinion relies on Plaintiff's allegations of pain. (Doc. 686-87). Said differently, to the extent Dr. Nickels' opinion points to objective evidence, his opinion relies on the fact Plaintiff "has been unrelieved" and "continues to have chronic intractable back pain". (Tr. 687). Although a doctor may consider a patient's allegations of pain, "[a] doctor's report that merely repeats the Plaintiff's assertions is not . . . entitled to protections of the good reasons rule." *Mitchell v. Comm'r of Soc. Sec*., 330 F. App'x 563, 569 (6th Cir. 2009).

Here, reliance on Plaintiff's allegations of pain is problematic because, as described by the ALJ, her allegations of pain are less than credible. (Tr. 33). To this end, although Plaintiff claimed to suffer from debilitating pain, she was able to work multiple hours at a clothing store where she testified she was "constantly" required to bend, pull, and stand. (Tr. 50). Moreover, she was able to ascend and descend a flight of fourteen stairs five times without any reported pain. (Tr. 749-50). Although Plaintiff claimed she needed a cane, multiple physicians questioned her use of the cane and Plaintiff eventually testified that she stopped using the device. (Tr. 61,

552, 557, 599). Further, Plaintiff indicated she could no longer take baths because she could not climb in and out of the tub, yet at the hearing, she said she "can't wait" to get into the tub to soak after work. (Tr. 64). For these and other reasons reported by the ALJ, Plaintiff's allegations of pain are less than credible.

Thus, the ALJ provided "good reasons" to afford Dr. Nickels' opinion less than controlling weight because the opinion made conclusions on an issue reserved to the Commissioner, was not supported by his own treatment records, and relied on Plaintiff's less-than-credible allegations of pain.

Finally, it should be noted that, as the Commissioner points out, the ALJ did not completely disregard evidence supporting Plaintiff's allegations. Rather, the ALJ limited Plaintiff to sedentary work with a sit-stand option and nonexertional limitations including work that never required Plaintiff to climb ladders, ropes, and scaffolds; and only occasionally climb stairs and ramps. (Tr. 20).

## CONCLUSION AND RECOMMENDATION

Undeniably, the record consists of a lengthy treatment history with conflicting opinions regarding Plaintiff's back and extremity pain. However, because substantial evidence supports the ALJ's determination and she provided good reasons for the weight afforded to the opinions of Drs. Nouraldin and Nickels, the undersigned recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified

time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985), *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).